737 N.W.2d 382 (2007)
2007 ND 138
STATE of North Dakota, Plaintiff and Appellee
v.
Johnny WASHINGTON, Defendant and Appellant.
No. 20060369.
Supreme Court of North Dakota.
August 22, 2007.
*384 James Allen Hope, Assistant State's Attorney, Dickinson, N.D., for plaintiff and appellee.
Danny Lee Herbel, Bismarck, N.D., for defendant and appellant.
VANDE WALLE, Chief Justice.
[¶ 1] Johnny Washington appealed from an amended order deferring imposition of sentence entered on a conditional plea of guilty to class C felony burglary. We conclude Washington's Fourth Amendment rights were not violated by law enforcement officers in effectuating his arrest and searching his vehicle. We affirm.

I
[¶ 2] At 4:18 a.m. on Sunday morning, January 15, 2006, Officer Brian Koskovich of the Dickinson Police Department was at a gas station preparing to refuel his patrol car when he was notified by a dispatcher of an "alarm call" from Army's West, a Dickinson bar. At the time, Koskovich happened to be located about one block from Army's West and he arrived at the bar two minutes after receiving the dispatch. A liquor store is located approximately 200 feet from the bar and there is a large parking lot between the establishments. As Koskovich entered the parking lot, he was "surprised" to see a "white vehicle come out from behind" the liquor store traveling west with its lights on. According to Koskovich, the white vehicle "stopped abruptly next to a parked vehicle [in the Army's West parking lot], the lights were turned off and the engine was turned off." Koskovich could tell the engine had been turned off because the temperature was "pretty close to zero" and "there was no exhaust coming out of the exhaust pipe." Koskovich considered the "abrupt stop . . . suspicious activity under the circumstances." Koskovich pulled 10 to 15 feet behind the white vehicle and ran a registration check on the vehicle, and the dispatcher informed him the vehicle was registered to Washington and another person. No one had exited the vehicle, and Koskovich was unable to see in the vehicle's windows because they were tinted.
[¶ 3] In the meantime, Dickinson Police Sergeant Parke Little arrived to check out the alarm call and found the front door of Army's West had been "smashed." Little radioed the information to Kostovich and Kostovich told Little to watch the white vehicle while he went to the front of the bar to maintain security until other officers arrived. Little pulled within 50 to 60 feet from the white vehicle and watched it for 15 to 20 minutes. No one exited the vehicle.
[¶ 4] When two other officers arrived at the scene, they did a security sweep of the bar and found the gaming area had been damaged, but discovered no one in the bar. Little, accompanied by the two other officers, approached the white vehicle. Little had a flashlight, shined it through the tinted windows and saw a person lying on the rear seat. Little pounded on the window with the flashlight "to the point where I was afraid it was going to break" and "[y]ell[ed]" that he was a police officer. The person in the back seat did not respond. Little testified he was "puzzled" by the failure to respond because "it's sub zero weather out there and you have [an] individual[ ] in a car *385 [that's] not running." After "a couple minutes" of pounding on the window without any response, one of the other officers called dispatch to summon a locksmith to come to the scene and unlock the car door.
[¶ 5] The officers waited for 15 to 20 minutes for the locksmith to arrive and continued trying to get the attention of the person in the backseat, but "[t]here was no movement at all that we saw." The locksmith eventually opened the passenger side door and Little then observed another person, later identified as Washington, lying on the floorboard of the front seat. The officers, with their weapons drawn, removed both people from the vehicle, handcuffed them, and placed them in the back seats of separate patrol cars. Officer Greg Barros, one of the six officers who eventually appeared at the scene, shined his flashlight through the open door of the white vehicle and spotted gloves, a hammer, and a crowbar under the driver and passenger front seats. Barros asked Washington for permission to search the vehicle, but Washington refused. The officers contacted the State's Attorney to obtain a search warrant and had the vehicle towed to the Dickinson Law Enforcement Center. After obtaining the warrant, the officers found further incriminating evidence in the vehicle, and Washington was later charged with class C felony burglary under N.D.C.C. § 12.1-22-02.
[¶ 6] Washington moved to suppress the evidence based on "the unlawful searches of the defendant's vehicle and the illegal seizures of the defendant and his vehicle." Following an evidentiary hearing, the district court denied the motion, concluding "law enforcement personnel had probabl[e] cause to enter and search the vehicle in which the Defendant and his companion were located." The court explained in its findings recited into the record at the close of the hearing:
The Court would agree that in order to approach the vehicle there had to be reasonable suspicion. I think there was reasonable suspicion. In order to open the door or have someone open the door, I think at that point you need probable cause for the search of the vehicle. The Court's view is that there was enough evidence known to law enforcement at the time to give them probable cause to search the vehicle. That evidence would be as pointed out by the State. A burglar alarm had sounded. The officer arrived a few minutes after the alarm call. The only vehicle that was seen at the scene is this white Oldsmobile. The time of day, 4:20 a.m. The vehicle stopped abruptly and parked, turned the lights out; enough for there to be reasonable suspicion to approach the vehicle. When the officers approached the occupants were non-responsive. They could observe  Officer Little testified he observed someone laying in the backseat. Apparently the person laying on the floorboard of the front was not observed but someone was observed in the vehicle and this was not just one or two minutes, this was 10-15 minutes. The officers  Officer Little testified he announced himself, whether he shouted or announced himself I think it was pretty clear that they were tapping, pounding on the vehicle, announcing themselves. When you get no response I think that was additional evidence that something is amiss here. Putting all of the pieces together at that point there was probable cause to search the vehicle. I think that the automobile exception applies. The vehicle had been driven a few minutes earlier. When we have the automobile exception the police can search the vehicle if they have probable cause for a search and that is what they did. Once the doors were open they observed the defendant and another individual, Mr. *386 Bigholm. They also observed the burglar tools, gloves, and whether or not they needed a search warrant, the policy was they were going to get a search warrant, and at that point they did it. I think the question is whether they had the probable cause to search the vehicle, have the door open in the first instance. I'm satisfied that putting all the pieces together there was probable cause, the automobile exception applies.
[¶ 7] Washington entered a conditional plea of guilty under N.D.R.Civ.P. 11(a)(2), reserving his right to appeal from the denial of his motion to suppress evidence.

II
[¶ 8] Washington argues the district court erred in denying the suppression motion because the law enforcement officers, without probable cause or a search warrant, contacted the locksmith to open the car door so they could enter the vehicle.
[¶ 9] In State v. Doohen, 2006 ND 239, ¶ 8, 724 N.W.2d 158 (quoting State v. Graf, 2006 ND 196, ¶ 7, 721 N.W.2d 381 (citations omitted)), we explained:
In reviewing a district court's decision on a motion to suppress evidence, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. We will affirm a district court's decision on a motion to suppress if there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. Our standard of review recognizes the importance of the district court's opportunity to observe the witnesses and assess their credibility. Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law.
[¶ 10] The Fourth Amendment to the United States Constitution and Article I, Section 8, of the North Dakota Constitution prohibit unreasonable searches and seizures and require that warrants be issued only upon a showing of probable cause. State v. Ebel, 2006 ND 212, ¶ 12, 723 N.W.2d 375; State v. Woinarowicz, 2006 ND 179, ¶ 21, 720 N.W.2d 635. Warrantless searches are unreasonable unless they fall within a recognized exception to the warrant requirement. State v. Tognotti, 2003 ND 99, ¶ 7, 663 N.W.2d 642. A "seizure" occurs for Fourth Amendment purposes when an "`officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" State v. Olson, 2007 ND 40, ¶ 9, 729 N.W.2d 132 (quoting City of Jamestown v. Jerome, 2002 ND 34, ¶ 5, 639 N.W.2d 478). In State v. Torkelsen, 2006 ND 152, ¶ 10, 718 N.W.2d 22, we identified permissible types of law enforcement-citizen encounters: "(1) arrests, which must be supported by probable cause; (2) Terry stops, see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), seizures which must be supported by a reasonable and articulable suspicion of criminal activity; and (3) community caretaking encounters, which do not constitute Fourth Amendment seizures."
[¶ 11] While community caretaking functions are "encounters which are `totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,'" Rist v. North Dakota Dep't of Transp., 2003 ND 113, ¶ 9, 665 N.W.2d 45 (quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)), investigative stops of automobiles and their occupants for suspected violations of law may be upheld if an officer has at least a reasonable suspicion that the motorist has violated the law or probable cause to believe the *387 motorist has done so. State v. Westmiller, 2007 ND 52, ¶ 9, 730 N.W.2d 134. In Westmiller, at ¶ 10, we explained the minimum standard to justify a stop:
Reasonable suspicion requires more than a mere hunch. State v. Smith, 2005 ND 21, ¶ 15, 691 N.W.2d 203. Reasonable suspicion for a stop exists when a reasonable person in the officer's position would be justified by some objective manifestation to suspect potential unlawful activity. Johnson v. Sprynczynatyk, 2006 ND 137, ¶ 9, 717 N.W.2d 586; Smith, at ¶ 15. The reasonable suspicion standard is objective and does not hinge upon the subjective beliefs or motivations of the arresting officer. State v. Leher, 2002 ND 171, ¶ 11, 653 N.W.2d 56. In order to determine whether an investigative stop is valid, we consider the totality of the circumstances and examine the information known to the officer at the time of the stop. Gabel [v. North Dakota Dep't of Transp.], 2006 ND 178, ¶ 11, 720 N.W.2d 433; State v. Torkelsen, 2006 ND 152, ¶ 13, 718 N.W.2d 22. The reasonable suspicion standard does not require an officer to rule out every possible innocent excuse for the behavior in question before stopping a vehicle for investigation. State v. Decoteau, 2004 ND 139, ¶ 14, 681 N.W.2d 803.
[¶ 12] In State v. Linghor, 2004 ND 224, ¶ 10, 690 N.W.2d 201, we explained the meaning of the more heightened standard of probable cause:
The long-prevailing standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection. On many occasions, we have reiterated that the probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept  turning on the assessment of probabilities in particular factual contexts  not readily, or even usefully, reduced to a neat set of legal rules.
The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.
[Maryland v. Pringle, 540 U.S. 366, 124 S.Ct. 795, 799-800, 157 L.Ed.2d 769 (2003)] (internal citations and quotations omitted). Further, "[i]n assessing whether there is probable cause to arrest, police officers need not have knowledge or facts sufficient to establish guilt [at trial], only knowledge that would give a prudent person reasonable grounds to believe an offense has been or is being committed." State v. Overby, 1999 ND 47, ¶ 13, 590 N.W.2d 703 (citing Torstenson v. Moore, 1997 ND 159, ¶ 17, 567 N.W.2d 622). The Supreme Court in Pringle concluded, "[t]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Pringle, 124 S.Ct. at 800.
The probable cause standard is the same for both searches and arrests. See *388 State v. Elison, 135 Idaho 546, 21 P.3d 483, 486 (2001); Matter of Welfare of G.M., 560 N.W.2d 687, 695 (Minn.1997); 2 W. LaFave, Search and Seizure § 3.1(b) (4th ed.2004).
[¶ 13] Although "mere presence" at or near the scene of a crime does not give rise to a reasonable suspicion of criminal activity or support a warrantless search, Torkelsen, 2006 ND 152, ¶ 15, 718 N.W.2d 22, there is much more than a "mere presence" near the scene of a crime in this case. Koskovich was in close proximity to Army's West when he received the dispatch about the alarm call and arrived at the scene within two minutes. It was 4:20 a.m. on a cold winter morning when he spotted the lone white vehicle with tinted windows being driven in the parking lot and "abruptly" stopping. The car engine and lights were turned off and no one exited the vehicle, even though the temperature was "pretty close to zero." After other officers arrived and it was confirmed that there had been a break in at the bar and no one was found inside, Little watched the vehicle for 15 to 20 minutes without seeing anyone exit or turn on the car for heat. Under the totality of the circumstances, we conclude that when Little and the other officers approached the vehicle to converse with its occupants, they had a reasonable and articulable suspicion that the occupants of the vehicle had violated the law.
[¶ 14] "An officer's approach to a parked vehicle is not a seizure if the officer inquires of the occupant in a conversational manner, does not order the person to do something, and does not demand a response." Lapp v. North Dakota Dep't of Transp., 2001 ND 140, ¶ 8, 632 N.W.2d 419. Little used his flashlight to peer into the vehicle, spotted a person lying on the back seat, and began pounding on the windshield to attempt to gain the occupant's attention and yelling that he was a police officer. These actions suggest Little and the other accompanying officers surrounding the vehicle were not acting in a community caretaker role during their encounter with the occupants, and the State does not contend that this was a community caretaker encounter rather than a seizure for Fourth Amendment purposes. See, e.g., State v. Boyd, 2002 ND 203, ¶ 10, 654 N.W.2d 392 (community caretaker exception inapplicable where law enforcement officer blocked vehicle's rear exit and issued orders to occupants and demanded compliance). We conclude the occupants of the white vehicle were seized by the law enforcement officers when the officers surrounded the vehicle in this case.
[¶ 15] Once a vehicle has been validly stopped and its occupants lawfully detained, law enforcement officers may constitutionally order the driver and passengers out of the vehicle, even in situations not amounting to arrest. See State v. Haverluk, 2000 ND 178, ¶ 20, 617 N.W.2d 652; State v. DuPaul, 509 N.W.2d 266, 270 (N.D.1993); see also Maryland v. Wilson, 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (passengers); Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (driver). This Court has also determined that no constitutional violation occurs when a law enforcement officer opens a vehicle door after receiving no response from vehicle occupants, see, e.g., Lapp, 2001 ND 140, ¶ 15, 632 N.W.2d 419; State v. Konewko, 529 N.W.2d 861, 863 (N.D.1995), and when an officer is unable to see inside a vehicle because of its tinted windows. See State v. Anderson, 2006 ND 44, ¶¶ 36-37, 710 N.W.2d 392; compare State v. Ferrise, 269 N.W.2d 888, 890 (Minn.1978) ("[T]here is little practical difference between ordering a driver to open his door and get out of his *389 car, on the one hand, and opening the door for the driver and telling him to get out, on the other. In this case, if the driver had not gotten out of the car on his own, the officer could have opened the door and told him to get out."). Here, despite Little and the other officers' repeated efforts to obtain a response from the individual lying in the back seat of a non-running vehicle in "sub zero weather" over a twenty-minute period, they saw "no movement at all." We believe the officers could reasonably form the belief that the person lying in the back seat, if not in need of assistance, was attempting to avoid detection. We conclude that, under the totality of the circumstances at this point, the law enforcement officers had probable cause to arrest the individual lying in the back seat, not only for physical obstruction of government function under N.D.C.C. § 12.1-08-01 and preventing arrest or discharge of other duties under N.D.C.C. § 12.1-08-02, but for the burglary that had occurred at the bar.
[¶ 16] "In making an arrest, an officer is under no obligation to retreat but has the legal right to press forward and accomplish the arrest." Jones v. Ahlberg, 489 N.W.2d 576, 580 (N.D.1992); see also N.D.C.C. § 29-06-13; Schell v. Collis, 83 N.W.2d 422, 425 (N.D.1957). Because law enforcement officers had the right to open a door to the white vehicle when the person in the back seat failed to respond, they certainly had the right to use appropriate forcible means to effectuate the arrest. See, e.g., Winters v. Adams, 254 F.3d 758, 761, 766 (8th Cir.2001) (officers acted reasonably in smashing the window of a vehicle after occupant rolled up windows, locked doors, and refused to exit); Miller v. Page, 2005 WL 3557426, *7 (W.D.Mo., Dec.28, 2005) (officers did not act unreasonably in breaking vehicle window to extract occupant who failed to respond to request that she roll down window and show her driver's license and refused to exit car); Lane v. State, 226 Md. 81, 172 A.2d 400, 405-06 (1961) (search and seizure was lawful even though officers broke window of vehicle to prevent occupant who had locked doors from driving away); Qualls v. State, 947 So.2d 365, 372 (Miss.App.2007) (when individual seen inside car did not respond to officer's requests to exit vehicle, officer had probable cause to break car window and detain occupants for additional questioning, and at the very least, charge them with misdemeanor failure to comply with lawful commands of police officer). Under the circumstances here, the officers' use of a locksmith to open the vehicle door to effectuate the arrest of the occupants was eminently reasonable under the Fourth Amendment. An arrest warrant was not required. See Linghor, 2004 ND 224, ¶ 8, 690 N.W.2d 201 ("Under North Dakota law an officer is authorized to arrest a person, without a warrant, for a public offense committed or attempted in the officer's presence; when the person arrested has committed a felony, although not in the officer's presence; and when a felony in fact has been committed and the officer has reasonable cause to believe the person arrested to have committed it"); N.D.C.C. § 29-06-15(1)(a-c).
[¶ 17] Once the door to the vehicle was opened and Washington was discovered hiding on the floorboard of the front seat, the officers had probable cause to arrest Washington as well. Barros shined his flashlight through the open door of the vehicle and saw gloves, a hammer, and a crowbar under the driver and passenger front seats in plain view. See State v. Parizek, 2004 ND 78, ¶ 22, 678 N.W.2d 154 (officer's "use of a flashlight to see inside of the van does not render her observations illegal under the plain view *390 doctrine"). Consequently, seizure of this evidence would have been justified under the plain view doctrine or as incident to a lawful arrest. See Anderson, 2006 ND 44, ¶ 38, 710 N.W.2d 392. The officers' use of caution in obtaining a search warrant before proceeding further, and their subjective beliefs as to the existence or nonexistence of reasonable suspicion and probable cause are of no moment. "An officer's subjective intent plays no role in ordinary probable cause Fourth Amendment analysis." State v. Leher, 2002 ND 171, ¶ 11, 653 N.W.2d 56; see also Westmiller, 2007 ND 52, ¶ 10, 730 N.W.2d 134 ("The reasonable suspicion standard is objective and does not hinge upon the subjective beliefs or motivations of the arresting officer").
[¶ 18] We have considered the other arguments raised by Washington and deem them to be without merit. We conclude Washington's Fourth Amendment rights were not violated in this case and the district court did not err in denying his suppression motion.

III
[¶ 19] The amended order deferring imposition of sentence is affirmed.
[¶ 20] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.